**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Monje and Beth Monje, husband and wife, individually and on behalf of their minor son; and RM, minor son,<br><br>    Plaintiffs,<br><br>v.<br><br>Spin Master Inc., a Delaware corporation; Spin Master Limited, a Canadian company; Toys "R" US-Delaware Inc.; and Moose Enterprises Proprietary Limited, an Australian company,<br><br>    Defendants. | No. CV-09-1713-PHX-GMS<br><br>**ORDER** |
| Spin Master, Inc., a Delaware corporation; Spin Master, LTD., a Canadian company,<br><br>    Third-Party Plaintiffs,<br><br>vs.<br><br>Bureau Veritas S.A.; Bureau Veritas Consumer Products Services, Inc.; Eurofins Scientific SE, and Product Safety Labs, Inc.,<br><br>    Third-Party Defendants. | |

Third Party Defendants Eurofins Scientific SE ("ESSE") and Product Safety Labs, Inc. ("PSL") have moved to be dismissed from Defendant/Third-Party Plaintiff Spin Master, Inc.'s Amended Third Party Complaint (the "Complaint") (Doc. 108) for lack of personal jurisdiction, moved to strike Spin Master's designation of ESSE and PSL as

nonparties at fault in its Amended Answer, and, in the alternative, moved to stay this litigation. (Doc. 126.) Third-Party Defendant Bureau Veritas S.A. ("BVSA") has likewise moved to dismiss the Complaint for lack of personal jurisdiction. (Doc. 131.) Third-Party Defendant Bureau Veritas Consumer Products Services, Inc. ("BVCPS") has moved to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim. (Doc. 130.) Finally, Spin Master filed a Motion, (Doc. 160), requesting that the Court order certain Parties to meet and confer again regarding the Motion to Strike, (Doc. 126). The Court grants the Motions to Dismiss for lack of personal jurisdiction, grants the Motion to Strike, denies the Motion to Stay as moot, denies the Motion to Dismiss under 12(b)(6), and denies Spin Master's Motion. The claim against BVCPS remains.[1]

## BACKGROUND[2]

The underlying case involves a toy called "Bindeez", which was designed by Defendant Moose Enterprises, Ltd., and which Spin Master marketed and sold in the United States as "Aqua Dots." (Doc. 1-1 (Am. Compl.) ¶ 7.) Aqua Dots are small, colorful beads that children could use to make various crafts. (*Id.* ¶ 16.) Aqua Dots arrived on the shelves of United States retailers on April 1, 2007. (*Id.* ¶ 20.) Spin Master distributed around four million packages of Aqua Dots in the United States. (Doc. 106-1, Ex. 15.)

In June 2007, Spin Master commissioned BVCPS to conduct acute oral ingestion toxicity testing on a sample of Aqua Dots. (Doc. 108 ¶ 12.) BVCPS is a Massachusetts corporation with its principal place of business in Buffalo, New York. (*Id.* ¶ 4.) It is a subsidiary of BVSA, which is a French company headquartered in Neuilly-sur-Seine, France. (Doc. 131-1, Ex. 1 ¶ 3.) The Bureau Veritas group "offers a wide range of

---

[1] The Parties' requests for oral argument are denied because they have had an adequate opportunity to discuss the law and evidence and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

[2] The Court takes as true the allegations contained in the Complaint at this stage of the litigation. *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996), with the exception of the disputed jurisdictional claims.

services to ensure a safety-assurance process and asset availability performance whatever the industry." (Doc. 142-2, Ex. B.)

BVCPS subcontracted with PSL to perform the oral toxicity testing. (Doc. 108 ¶ 13; Doc. 129-1, Exs. A, B.) PSL is a Delaware company whose offices are located in New Jersey. (Doc. 127 (Wnorowski Decl.) ¶ 2.) It is a member of the Eurofins group of companies, which is owned by ESSE, a Luxembourg holding company. (Doc. 128 (Vaussy Decl.) ¶ 3.) Like the other members of the Eurofins Group, PSL performs laboratory testing of various products. (Doc. 108 ¶ 13.)

BVCPS and its subcontractor, PSL, understood that Spin Master marketed and sold Aqua Dots to children and that the testing was to ensure that the product would not endanger a child who ingested the dots. (*Id.*) Nevertheless, according to the allegations of the Third-Party Complaint, PSL unnecessarily delayed the testing and then did not administer the proper dosage to the test animals. (*Id.* ¶ 14–15.)

At some point in 2007, Plaintiffs Mark and Beth Monje purchased Aqua Dots from a Toys "R" Us store in Maricopa County, Arizona. (Doc. 1-1 (Am. Compl.) ¶ 11.) In July of 2007, Plaintiff RM, the Monjes' 18-month-old son, ate some Aqua Dots. (*Id.*) Unbeknownst to the Monjes, Aqua Dots contained 1,4-butanediol, a harmful toxin that, when metabolized, converts into GHB, also known as the "date rape" drug. (*Id.* ¶ 22.) RM experienced "significant seizures, continued vomiting, went into respiratory failure, required intubation, and slipped into a coma." (*Id.* ¶ 13.) He was air-evacuated to Phoenix Children's Hospital. (*Id.*) RM suffered severe and permanent injuries to his brain and central nervous system. (*Id.* ¶ 15.) Nurses found Aqua Dots in RM's vomit. (*Id.* ¶ 13.)

PSL eventually provided its analysis to BVCPS, which sent it to Spin Master. (Doc. 108 ¶ 16.) The report stated that the Aqua Dots sample was "not . . . toxic as defined in and tested per 16 CFR 1500.3(c)(2)(i)(A), 'Acute oral toxicity' (FHSA regulations)." (Doc. 130-1, Ex. A.)[3] That report arrived on August 10, 2007, some time

---

[3] The Court takes judicial notice of the toxicity report because it is a document "whose contents are alleged in a complaint and whose authenticity no party questions, but

after RM had ingested the Aqua Dots and suffered his injuries. (*Id.*; Doc. 1-1 (Am. Compl.) ¶ 11.)

On November 7, 2007, the United States Consumer Product Safety Commission ordered the recall of all Aqua Dots after several reports of injuries similar to those suffered by RM surfaced in the media. (Doc. 1-1 (Am. Compl.) ¶ 21.) The Monjes bring a variety of product liability claims against Moose, Spin Master, and Toys "R" Us. Spin Master seeks common law and implied indemnification from ESSE, PSL, BVSA, and BVCPS.

## DISCUSSION

Three of the four Third-Party Defendants challenge the exercise of the Court's jurisdiction over them. Because a jurisdictional challenge has been raised, the Court will consider those arguments before moving to question of whether Spin Master has stated a claim for common law immunity.

## I.      PERSONAL JURISDICTION

### A.      Legal Standard

Spin Master, as the Third-Party Plaintiff, bears the burden of establishing personal jurisdiction. *See, e.g., Ziegler v. Indian River Cnty.*, 64 F.3d 470, 473 (9th Cir. 1995). Once a defendant has moved to dismiss, "the plaintiff is obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction" over the defendant. *Cummings v. W. Trial Lawyers Assoc.*, 133 F. Supp. 2d 1144, 1151 (D. Ariz. 2001) (internal quotations omitted). "[M]ere allegations of a complaint, when contradicted by affidavits, are not enough to confer personal jurisdiction over a non-resident defendant." *Chem Lab Prods., Inc. v. Stepanek*, 554 F.2d 371, 372 (9th Cir. 1977); *Data Disc, Inc. v. Sys. Tech. Assocs.,* 557 F.2d 1280, 1285 (9th Cir. 1977) ("[W]e may not assume the truth of allegations in a pleading which are contradicted by affidavit.") A court may look to affidavits submitted by the parties in its determination. *Doe v. Unocal Corp.*, 248 F.3d

which are not physically attached to the [plaintiff's] pleading," *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.2005) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999) (alteration in original).

915, 922 (9th Cir. 2001). However, "conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiffs'] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists." *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).

Because no statutory method for resolving the personal jurisdiction issue exists, the district court determines the method of its resolution. *See Data Disc,* 557 F.2d at 1285 (citing *Gibbs v. Buck*, 307 U.S. 66, 71-72 (1939)). A district court may, but is not required to, allow discovery to help determine whether it has personal jurisdiction over a defendant. *See id.* at 1285 n.1. In addition, a district court may, but is not required to, hear evidence at a preliminary hearing to determine its jurisdiction. *See id.* at 1285 n.2. If the district court does not hear testimony or make findings of fact and permits the parties to submit only written materials, then the plaintiff must only make a prima facie showing of jurisdictional facts to defeat the defendant's motion to dismiss. *See Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 268 (9th Cir. 1995). Under this prima facie burden of proof, the plaintiff need only establish facts, through admissible evidence, that if true would support personal jurisdiction over the defendant. *See Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). The Court has determined to proceed on the written materials submitted by the Parties and apply the lower prima facie standard.

**B.    Analysis**

To establish that personal jurisdiction over ESSE, PSL, and BVSA exists, Spin Master must demonstrate that (1) Arizona's long arm statute confers jurisdiction over those Parties, and (2) that "the exercise of jurisdiction comports with the constitutional principles of Due Process." *See Rio Props. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002) (citation omitted); Fed. R. Civ. P. 4(k)(1)(A). Because Arizona's long-arm statute extends jurisdiction "to the maximum extent permitted by the . . . Constitution of the United States," the personal jurisdiction inquiry collapses into a Due Process analysis. *See* Ariz. R. Civ. P. 4.2(a); *Davis v. Metro Prod., Inc.*, 885 F.2d 515, 520 (9th Cir. 1989); *Williams v. Lakeview Co.*, 199 Ariz. 1, 5, 13 P.3d 280, 282 (2000). Absent

traditional bases for personal jurisdiction (e.g., physical presence, domicile, and consent) the Due Process Clause requires that nonresident defendants have certain "minimum contacts" with the forum state such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

"In determining whether a defendant had minimum contacts with the forum state such that the exercise of jurisdiction over the defendant would not offend the Due Process Clause, courts focus on 'the relationship among the defendant, the forum, and the litigation.'" *Brink v. First Credit Resources*, 57 F. Supp. 2d 848, 860 (D. Ariz. 1999) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). If a defendant's contacts with the forum state are sufficient to satisfy the Due Process Clause, then the Court must exercise either "general" or "specific" jurisdiction over the defendant. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414–15 nn.8–9 (1984); *Ziegler*, 64 F.3d at 473. The nature of a defendant's contacts with the forum state will determine whether the Court exercises general or specific jurisdiction over him. *Helicopteros Nacionales*, 466 U.S. at 414–15 nn.8–9. Spin Master rests its jurisdictional case on the presence of general jurisdiction for each of the three Third-Party Defendants who have moved to dismiss.

The Court may assert general jurisdiction over ESSE, PSL, and BVSA only if the activities of each entity in Arizona are substantial or continuous and systematic. *See Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1396 (9th Cir. 1986)); *Data Disc*, 557 F.2d at 1287 (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 446–47 (1952)). If those contacts are present, then the reasonableness of exercising jurisdiction is considered. *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 919–20 (9th Cir. 2011), *cert. granted*, ___ S. Ct. ___, 11-965, 2013 WL 1704716 (Apr. 22, 2013).

In each case, Spin Master makes no argument that ESSE, PSL, or BVSA themselves have substantial or continuous and systematic contacts with Arizona. Instead,

- 6 -

Spin Master seeks to take the Arizona contacts of other non-party subsidiaries and funnel them back up to the parent companies (ESSE and BVSA) and out to a sister company (PSL). The Ninth Circuit has provided two theories to enable a plaintiff to take a subsidiary's forum contacts and attribute them to the parent company.

### 1.    Alter Ego

First is the alter ego theory. To allow a court to impute a subsidiary corporation's contacts with a forum to the parent, the plaintiff must make a prima facie showing that the "parent and subsidiary are not really separate entities . . . ." *Unocal*, 248 F.3d at 926. Since this is a diversity case, state law determines whether a parent company should be treated as the alter-ego of a subsidiary for jurisdictional purposes. *See Hambleton Bros. Lumber Co. v. Balkin Enters.*, 397 F.3d 1217, 1227 (9th Cir. 2005) (noting that in diversity actions, federal courts must apply state law when evaluating alter-ego status); *see also Davis v. Metro Prods.*, 885 F.2d 515, 520–21 (9th Cir. 1989) (sitting in diversity and applying Arizona's test for piercing the corporate veil to determine whether a subsidiary's contacts should be imputed to the parent). Under Arizona law, "corporate status will not be lightly disregarded." *Chapman v. Field*, 124 Ariz. 100, 102, 602 P.2d 481, 483 (1979).

To pierce the corporate veil or demonstrate alter-ego status, a "plaintiff[ ] must prove both (1) unity of control and (2) that observance of the corporate form would sanction a fraud or promote injustice." *Gatecliff v. Great Republic Life Ins. Co.*, 170 Ariz. 34, 37, 821 P.2d 725, 728 (1991). In determining whether a parent and subsidiary share "unity of control," Arizona courts often consider the following factors: stock ownership by the parent; common officers or directors; financing of subsidiary by the parent; payment of salaries and other expenses of subsidiary by the parent; failure of subsidiary to maintain formalities of separate corporate existence; similarity of logo; and plaintiff's lack of knowledge of subsidiary's separate corporate existence. *Id.* Isolated occurrences of a few of these factors are not enough to justify an alter ego theory. *See Patterson v.*

*Home Depot, USA, Inc.*, 684 F. Supp. 2d 1170, 1177–79 (D. Ariz. 2010). In addition, the parent corporation must exert "substantially total control" over the subsidiary so that the subsidiary becomes "a mere instrumentality" of the parent. *Gatecliff*, 170 Ariz. at 37; *Taeger v. Catholic Family & Cmty. Serv.*, 196 Ariz. 285, 297–98, 995 P.2d 721, 733–34 (Ct. App. 2000). In sum, "[a]n alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations." *Unocal*, 248 F.3d at 926 (citing *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir. 1980)).

### a.    ESSE

ESSE is a Luxemborg holding company. (Doc. 128 (Vaussy Decl.) ¶ 3.) It does not do any business in Arizona or any of the fifty states. (*Id.* ¶¶ 4–5.) ESSE has never engaged in any activities in Arizona. (*Id.*) As a holding company, ESSE has an ownership interest in many other companies that operate product safety testing labs. (Doc. 141-2, Ex. A.) According to its shareholder letter, these subsidiaries form the Eurofins Group. (Doc. 141-2, Ex. B at 4.) The Eurofins Group encompasses a network whose companies employ "over 10,000 staff in more than 150 laboratories across 30 countries." (*Id.* at 3.)

ESSE, however, does not perform any laboratory testing itself. It functions only as the "holding company" and "magage[s] its investments and the financing of the activities of its subsidiaries, provide[s] support, facilitate[s] communication and develop[s] resources that are available Group-wide." (*Id.* at 18.) "The decentralized organization of the Group in autonomous clusters and business unites enables the subsidiaries to make decisions at the ground level and to maintain some independence." (*Id.*) Nevertheless, "[s]trategic choices are determined and approved at a central level." (*Id.*)

Spin Master seeks to impute the Arizona contacts of one of ESSE's subsidiaries, Eurofin Eaton Analytical ("EEA"), back to ESSE. EEA, which is not party to this case, is a Delaware company situated in Scottsdale, Arizona. (Doc. 141-2, Exs. D, K.) EEA appears to perform a range of product tests at its Arizona labs, but it did not test the Aqua

- 8 -

Dots product and is not involved in the underlying case. ESSE does not assert that general jurisdiction does not exist over EEA.

None of the facts that Spin Master cites demonstrate that EEA functions as the alter ego of ESSE. Spin Master focuses on ESSE's description of its subsidiaries as members of the "Eurofins North American Environmental family," (Doc. 141-3, Ex. J), and the fact that ESSE aggregates its subsidiaries' financial performance in ESSE's financial reports (Doc. 141-2, Ex. B). That type of financial reporting is standard practice for a holding company like ESSE and will not result in a court breaking down the corporate walls between ESSE and EEA. *See Unocal.*, 248 F.3d at 928 ("Likewise, references in the parent's annual report to subsidiaries or chains of subsidiaries as divisions of the parent company do not establish the existence of an alter ego relationship."). Nor does the fact that ESSE provided EEA "in excess of $1M in capital for increased equipment capacity", (Doc. 141-3, Ex. J), establish unity of control. The provision of loans, so long as the companies observe corporate formalities, does not fuse a subsidiary and parent together for purposes of the law. *See Unocal*, 248 F.3d at 928; *Kramer Motors*, 628 F.2d at 1177. The Ninth Circuit has "found no alter ego relationship was created where the parent company guaranteed loans for the subsidiary, reviewed and approved major decisions, placed several of its directors on the subsidiary's board, and was closely involved in the subsidiary's pricing decisions." *Unocal*, 248 F.3d at 928 (citing *Kramer Motors*, 628 F.2d at 1177).

ESSE appears to adequately observe corporate formalities. Its role is limited to "manag[ing] its investments and the financing of the activities of its subsidiaries, provid[ing] support, facilitat[ing] communication and develop[ing] resources that are available Group-wide." (Doc. 141-2, Ex. B at 18.) The fact that "[s]trategic choices are determined and approved at a central level", (*id.*), does not rise to unified control. As the

Supreme Court made clear in a case concerning corporate liability,[4] there is an important distinction between oversight and control. *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (distinguishing "a parental officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility"). A parent company's involvement in the affairs of its subsidiaries is to be expected. Thus, appropriate parental involvement includes "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures[.]" *Id.*

At best, then, the evidence submitted by the Parties shows merely that ESSE is a typical parent company. It provides general policies to its subsidiary, keeps track of its financial performance, and tries to implement a certain product culture. Only when a parent exerts day-to-day control over "the subsidiary's internal affairs or . . . operations" does the subsidiary transform into the parent's alter ego. *Unocal*, 248 F.3d at 926. Spin Master has not shown that ESSE dictates the day-to-day running of EEA's business.

The remaining arguments that Spin Master advances focus on the cosmetic and not the functional. For example, Spin Master relies on the fact that the EEA website uses the Eurofin logo and incorporates "Eurofin" into its company name. Similar or identical logos can be an outward indicator of internal domination, but do not demonstrate by themselves "that one company dominated another's business activities or acted as its alter-ego." *Patterson*, 684 F. Supp. 2d at 1179. Because Spin Master has not shown that ESSE exerts "substantially total control" over EEA, see *Gatecliff*, 170 Ariz. at 37, it cannot rely on an alter ego theory to establish personal jurisdiction over EEA.

### b.    PSL

---

[4] The Ninth Circuit has looked to these cases to assist in evaluating an alter ego theory for jurisdictional purposes. *See Unocal*, 248 F.3d at 926.

PSL is EEA's sister company. Spin Master cited no authority for the idea that a company's forum contacts can be imputed *horizontally* to a sister company through an alter ego theory. Even if such a theory were cognizable, Spin Master has presented no facts that would show that EEA was functioning as PSL's alter ego. This theory does not establish jurisdiction over PSL.

### c.    BVSA

BVSA is a French company. (Doc. 131-1, Ex. 1 ¶ 3.) It has no physical presence in Arizona, owns no property in Arizona, does not have a bank account, and transacts no business in Arizona. (*Id.* ¶¶ 4–5.) It is the parent company of a group that uses the Bureau Veritas trademark, including BVCPS. (*Id.* ¶¶ 6–7.) BVSA's website refers to "the Group" that comprises "more than 940 offices and 340 laboratories located in 140 countries." (Doc. 142-2, Ex. A.) Its 2012 Full-Year Results report the financials of each BVSA company together. (Doc. 142-2, Ex. C.) BVSA also speaks of a unifying company culture that it wants to see manifest in each of its subsidiaries. (*Id.*, Ex. F at 35.) "[T]he Chief Executives of the Group's vertical operating businesses" serve on an Executive Committee (different than the Board of Directors), which serves as "the operational management body of the Group." (*Id.*, Ex. H.) These Chief Executives have responsibility over "the major geographic zones of the Industry & Facilities division, and of the support functions." (*Id.*)

Spin Master seeks to impute the Arizona contacts of a BVSA subsidiary back to the parent. One of BVSA's subsidiaries is Bureau Veritas North America, Inc. ("BVNA"). BVNA is an Arizona corporation headquartered in Fort Lauderdale, Florida. (Doc. 142-2, Ex. I.) BVNA appears to have some facility that is located in Phoenix. (*Id.*, Ex. J.) Nevertheless, BVNA's general counsel has averred that BVNA does not have laboratories, real estate, or offices in Arizona. (*Id.* ¶ 4.) The President and CEO of BVNA serves on the Executive Committee. (*Id.*, Exs. H, I.)

BVSA challenges Spin Master's assumption that this Court would have general jurisdiction over BVNA. The standard for establishing general jurisdiction is "fairly high and requires that the defendant's contacts be of the sort that approximate physical presence." *See Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000) (internal citation and quotation marks omitted), *holding modified in nonrelevant part by Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006). In other words, exercise of general jurisdiction requires "continuous corporate operations within a state [that are] thought so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely distinct from those activities." *King v. Am. Family Mut. Ins. Co.*, 632 F.3d 570, 579 (9th Cir. 2011) (internal quotation marks omitted). Indicia of this type of presence include "whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Bancroft & Masters*, 223 F.3d at 1086 (citing *Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1478 (9th Cir. 1986)).

BVNA is an Arizona corporation that is licensed to do business in this state. (Doc. 142-2, Ex. I.) It has appointed a registered agent to receive service of process here. (*Id.*) According to its website, BVNA has some type of facility that is located in Phoenix. (*Id.*, Ex. J.) While Spin Master has not produced any evidence that BVNA solicits business in Arizona, the facts that it has produced are sufficient to state a prima facie case for general jurisdiction. Critical to this analysis is that BVNA has chosen to incorporate itself under Arizona laws. The Court has found no cases—nor has BVSA cited any—where an entity that was incorporated in a given state, had a registered agent in that state, and had some facility in the state was nevertheless not subject to jurisdiction in that state. Accordingly, BVNA's Arizona incorporation, registered agent, business license, and facility create sufficiently pervasive contacts to assume that it would be subject to general jurisdiction.

Nevertheless, for reasons similar to those discussed with ESSE in part I.B.1.a, Spin Master has not shown that BVNA is an alter ego of BVSA. BVSA's description of its subsidiaries as members of "the Group" and aggregate financial reporting are standard practices for a parent company. *See Bestfoods*, 524 U.S. at 69; *Unocal*, 248 F.3d at 928 ("Likewise, references in the parent's annual report to subsidiaries or chains of subsidiaries as divisions of the parent company do not establish the existence of an alter ego relationship."). While BVNA's President and CEO sits on BVSA's Executive Committee, which serves as "the operational management body of the Group", (Doc. 142-2, Exs. H, I), he does not sit on BVSA's controlling board of directors. And, in any event,

> it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts. This recognition that the corporate personalities remain distinct has its corollary in the well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership.

*Bestfoods*, 524 U.S. at 69; *see also Kramer Motors*, 628 F.2d at 1177 (no alter ego where parent placed several of its directors on the subsidiary's board). While Arizona courts have looked to whether there are common officers or directors between the parent and subsidiary, see *Gatecliff*, 170 Ariz. at 37, Spin Master has not shown that the membership of BVNA's CEO on BVSA's Executive Committee results in BVSA's essential control over BVNA's day-to-day operations. Essential control is the ultimate touchstone of this inquiry and the facts Spin Master advances do not show that level of control. Consequently, "[Spin Master's] evidence here establishes only that [BVSA] is an active parent corporation involved directly in decision-making about its subsidiaries' holdings. Because [BVSA] and its subsidiaries observe all of the corporate formalities necessary to maintain corporate separateness, the . . . alter ego test is not satisfied . . . ." *Unocal*, 248 F.3d at 928.

- 13 -

## 2. Agent

Another way to impute a subsidiary's contacts to the parent company is to show that the subsidiary is acting as the agent for the parent. In this context, agency means "that the subsidiary functions as the parent corporation's representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Bauman*, 644 F.3d at 920. In addition, the parent company must have the right to control its agent, the subsidiary. *Id.* at 923.

### a. ESSE

Spin Master has not shown that EEA is such an integral part of ESSE's investment portfolio that, absent EEA's work in Arizona, ESSE itself would undertake to run an Arizona laboratory. ESSE is not a laboratory company—it is a holding company. As the Ninth Circuit has recognized, application of the agency theory to a holding company is inapt: "in the case of a holding company the parent could simply hold another type of subsidiary, in which case imputing the subsidiaries' jurisdictional contacts to the parent would be improper." *Unocal*, 248 F.3d at 929 (internal citations omitted). Holding companies do not engage in the business of the companies they own; they are "really in the business of investing, not selling products." *MMI, Inc. v. Baja, Inc.*, 743 F. Supp. 2d 1101, 1112 (D. Ariz. 2010). ESSE's business is investing in product safety companies, not performing product safety tests itself. ESSE's companies have "over 10,000 staff in more than 150 laboratories across 30 countries." (*Id.* at 3.) ESSE has more than one laboratory available to service the United States (EEA in Arizona, PSL in New Jersey). On these facts, EEA's services are not so important that, in its absence, ESSE would immediately set up its own laboratory *in Arizona*.

In any event, Spin Master has also failed to show that ESSE has the necessary right to control EEA. While the showing of control is lessened under an agency theory than an alter ego theory, the parent still needs to have a substantial right to control the

subsidiary. *See Bauman*, 644 F.3d at 923. Control is a core component of agency law. *Ruesga v. Kindred Nursing Ctrs.*, 215 Ariz. 589, 597, 161 P.3d 1253, 1261 (Ct. App. 2007); Restatement (Third) of Agency § 1.01 (2006). For the reasons discussed in part I.B.1.a, Spin Master has failed to demonstrate that ESSE maintains the requisite level of control over EEA. Indeed, ESSE expressly disclaims such control: "The decentralized organization of the Group in autonomous clusters and business unites enables the subsidiaries to make decisions at the ground level and to maintain some independence." (Doc. 141-2, Ex. B at 18.) ESSE's reservation of power to make "strategic choices" is not a sufficient level of control to show the formation of an agency relationship. Consequently, Spin Master has not shown that ESSE's control over EEA was "over and above that which is to be expected as an incident of ownership." *Patterson*, 684 F. Supp. 2d at 1182 (internal citation omitted).

### b.    PSL

Spin Master does not advance any argument for why EEA functions as the effective agent for PSL, nor could it in light of the relationship between the two companies.

### c.    BVSA

Spin Master also fails to establish the existence of an agency relationship between BVSA and BVNA, largely for the reasons discussed above in part I.B.2.a with ESSE. BVNA arguably plays a larger role in the operations of BVSA than EEA played for ESSE, but that role is not so essential that BVSA would immediately step in itself to fill BVNA's role. Once more, this agency theory is ill-suited to the operations of holding companies, which function as investment vehicles, not separate enterprises. Furthermore, there is a much longer chain of companies between BVNA and BVSA: BVNA is a wholly owned subsidiary of U.S. Laboratories, Inc., which is a wholly owned subsidiary of Bureau Veritas Holdings Inc., which is a wholly owned subsidiary of BVSA. (Doc. 151-1, Ex. 1 ¶ 3.) Spin Master has not demonstrated that BVSA would be forced to

bypass these entities to immediately fill the shoes of BVNA should BVNA somehow disappear.

And, again, Spin Master has not shown a sufficient level of control for an agency relationship to be present. On the evidence before the Court, BVSA exerts only that level of control that should be expected of a parent company. More is needed if Spin Master were to succeed in establishing personal jurisdiction via EEA.

In sum, Spin Master has failed to establish a prima facie case for jurisdiction over ESSE, PSL, and BVSA. Spin Master has not shown that any of those entities themselves have sufficiently pervasive contacts with Arizona to warrant the exercise of personal jurisdiction, nor has it shown that contacts of subsidiary or sister companies should be imputed to these Third-Party Defendants for jurisdictional purposes. Spin Master has requested an opportunity to conduct limited discovery on the question of jurisdiction. That request is denied. District courts retain discretion in how to evaluate the question of personal jurisdiction. *See Data Disc*, 557 F.2d at 1285 nn. 1–2. Spin Master has not shown any colorable basis for jurisdiction that later discovery might flesh out. Consequently, ESSE, PSL, and BVSA are dismissed from the case.

## II.     MOTION TO STRIKE

ESSE and PSL have moved to strike Spin Master's designation of them as nonparties at fault. (Doc. 126.) Arizona's comparative fault statute allows the trier of fact to consider the fault of non-parties when assessing percentages of fault. Ariz. Rev. Stat. § 12-2506(B). In order for a party to take advantage of § 12-2506(B), however, it must "provide the identity, location, and the facts supporting the claimed liability of" any "person or entity not currently or formerly named as a party . . . within one hundred fifty (150) days after the filing of that party's answer . . . ." Ariz. R. Civ. P. 26(b)(5).[5] Because

---

[5] Contrary to the arguments of Spin Master in its Motion for an Order Directing the Parties to Further Meet and Confer (Doc. 160), ESSE and PSL's citation to the previous version of the Rule did not affect their arguments or the Court's disposition here.

the deadline for the filing of the Non-Party at Fault designation is inextricably intertwined with Arizona's substantive law, this deadline protects substantive rights, and therefore, Arizona law applies in federal court. *See Wester v. Crown Controls Corp.*, 974 F. Supp. 1284, 1288 (D. Ariz. 1996).

The Parties dispute how to interpret Rule 26(b)(5)'s 150-day requirement. Spin Master filed its answer on October 15, 2009. (Doc. 12.) It did not designate any non-parties at fault in that Answer. The case was transferred to the Northern District of Illinois on December 10, 2009, to be consolidated as part of a multi-district litigation ("MDL") involving Aqua Dots. (Docs. 13, 14.) The Northern District of Illinois remanded the case back to this Court on May 3, 2012. (Doc. 49.) Spin Master filed an Amended Answer on October 23, 2012. (Doc. 83.) This time, it designated ESSE and PSL as non-parties at fault pursuant to § 12-2506(B). (*Id.* ¶ 44.) Although Spin Master filed its Third-Party Complaint on the same day as the Amended Answer, the Amended Answer was docketed first and the Court assumes that ESSE and PSL were therefore "entit[ies] not currently or formerly named as a party" in the lawsuit at the time Spin Master filed its Amended Answer such that Rule 26(b)(5) applies.

This Court has previously held that the 150-day filing period runs from the initial answer. *Daly v. Royal Ins. Co. of Am.*, CIV 00-0040-PHX-SRB, 2002 WL 1768887 at *17 (D. Ariz. July 17, 2002). Spin Master does not advance any argument for why it should be otherwise. In fact, the policy that Rule 26(b)(5) seeks to advance is served by counting from the initial answer: "As we have explained, the purpose of Rule 26(b)(5) is 'to identify for the plaintiff any unknown persons or entities who may have caused the injury in time to allow the plaintiff to bring them into the action before the statute of limitations expires.'" *Scottsdale Ins. Co. v. Cendejas*, 220 Ariz. 281, 286, 205 P.3d 1128, 1133 (Ct. App. 2009) (quoting *LyphoMed, Inc. v. Sup. Court*, 172 Ariz. 423, 428, 837 P.2d 1158, 1163 (Ct. App. 1992)). That policy is best served by starting the clock with the initial answer.

Spin Master contends that the 150-day period should be tolled for the period of time this case was part of the Aqua Dots MDL and during the extension of time this Court granted in which to file an amended answer. The case joined the MDL for pre-trial discovery purposes 58 days after Spin Master filed its Answer. Contrary, however, to Spin Master's arguments, the case was not "dormant and effectively stayed while consolidated with the MDL proceeding." (Doc. 141 at 16.) A review of the docket shows that motions were filed and discovery requests were served during this period. (Docs. 21, 24–26, 31.) Spin Master was not barred from complying with Rule 26(b)(5) during that period of time. In light of the policy considerations behind Rule 26(b)(5), the Court concludes that it should not be tolled in this situation. Nor are there equitable reasons to toll the period—Spin Master has not shown that it only recently came across evidence that ESSE and PSL may bear fault for the injuries alleged by the Monjes. Indeed, it sued ESSE and PSL for their involvement in the testing back in January 2009. (Doc. 129-1, Ex. D.) Accordingly, Spin Master failed to timely designate ESSE and PSL as non-parties at fault and that untimely designation will be stricken.

Spin Master also filed a Motion for an Order Directing the Parties to Further Meet and Confer and for Further Briefing, as Necessary (Doc. 160), in which it claims that ESSE and PSL never conferred with Spin Master regarding the argument that the designation of ESSE and PSL as nonparties at fault untimely. This Court has a standard Order that requires the Parties to "meet and confer prior to the filing of a motion to dismiss to determine whether it can be avoided. . . . [M]otions to dismiss must contain a certification of conferral indicating that the parties have conferred to determine whether an amendment could cure a deficient pleading, and have been unable to agree that the pleading is curable by a permissible amendment." (Doc. 109.) By its terms, the Order applies only to motions to dismiss and not motions to strike. In addition, the designation of nonparty at fault was an affirmative defense asserted by Spin Master in its Answer to the underlying Complaint and not in its Third-Party Complaint against ESSE and PSL.

The required conferral is designed to address arguments relating to the Third-Party Complaint in which Spin Master asserts its claims against ESSE and PSL. Therefore, ESSE and PSL were under no obligation to meet and confer regarding their Motion to Strike.

## III.   FAILURE TO STATE A CLAIM

### A.   Legal Standard

Rule 12(b)(6) is designed to "test the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). To survive dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action"; it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* When a complaint does not "permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotation omitted).

When analyzing a complaint for failure to state a claim under Rule 12(b)(6), "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not

1  sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir.

2  1998).

3    **B.    Common Law Indemnification**

4    BVCPS argues that Spin Master has failed to state a claim for common law and

5  implied indemnity.[6] To prevail on a common law indemnity claim in Arizona, a plaintiff

6  must show: "First, [that] it has discharged a legal obligation owed to a third party;

7  second, [that] the indemnity defendant was also liable to the third party; and third, [that]

8  as between itself and the defendant, the obligation should have been discharged by the

9  defendant." *MT Builders, L.L.C. v. Fisher Roofing, Inc.*, 219 Ariz. 297, 303, 197 P.3d

10 758, 764 (Ct. App. 2008) (citing *Am. & Foreign Ins. Co. v. Allstate Ins. Co.*, 139 Ariz.

11 223, 225, 677 P.2d 1331, 1333 (Ct. App. 1983)). BVCPS contests the adequacy of Spin

12 Master's pleading of the second and third elements.

13    **1.    Liability of BVCPS to the Monjes**

14    The Monjes allege that Spin Master and its co-defendants were "negligent,

15 careless, and reckless in designing, manufacturing, marketing, distributing, and selling

16 the Aqua Dots. (Doc. 1-1 (Am. Compl.) ¶ 49.) As it relates to the testing efforts that

17 BVCPS performed for Spin Master, the Monjes contend that "Spin Master, indifferent to

18 the significant risk to the health and safety of children, placed the Aqua Dots in the

19 stream of commerce, without conducting safety tests." (*Id.* ¶ 23.) The Monjes are

20 therefore alleging that Spin Master was negligent for failing to conduct adequate tests,

21 tests that would have revealed the toxicity of the chemical that coated the Aqua Dots.

22

23  _____

24

25    [6] All Parties assume that Arizona law applies to the question of whether a common
    law or implied right to indemnity exists between Spin Master and BVCPS. In a footnote
26  in its Response, Spin Master claims that "[a]s discovery proceeds in this case, it will
    become apparent that New York law applies as between Spin Master and BVCPS." (Doc.
27  143 at 14 n.3.) Neither Spin Master nor BVCPS, however, briefed the Motion in reliance
    on Arizona law. It is not clear on what basis Arizona law would apply to Spin Master's
28  claims against BVCPS. Yet because the Parties are assuming that Arizona law applies,
    the Court will proceed on that assumption for purposes of this Motion.

To claim indemnity, Spin Master asserts that BVCPS is independently liable to the Monjes. Liability from an indemnity defendant to a third party generally arises out of an independent legal duty between them. *See Am. & Foreign Ins.*, 139 Ariz. at 225 (referring to liability as "duty"); *see also* Restatement (First) of Restitution § 76 cmt. a (1937) ("The rule . . . applies where two or more persons are subject to a duty to a third person . . . ."). Spin Master's theory is that BVCPS itself was negligent in relation to the Monjes.[7]

The elements of a negligence case are well-known: "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 214 Ariz. 141, 143, 150 P.3d 228, 230 (2007). Consequently, BVCPS must show that the pleadings in this case do not establish the existence of duty that runs from BVCPS, the product testers, to the Monjes, the ultimate consumers, breach, causation, and damages. The Parties focus only on the issues of duty and causation.

### a. Duty

Duties of care may arise from special relationships. *Stanley v. McCarver*, 208 Ariz. 219, 221 ¶ 7, 92 P.3d 849, 851 (2004). Typical touchstones of duty include a state's statutes and cases and special relationships between the parties that derive from contracts, family relations, or specific undertakings. *See id.* at 221 (finding that radiologist, though not a doctor, performed a specific undertaking relative to a patient and that a duty should be implied). A special or direct relationship, however, is not essential in order for there to be a duty of care. *Gipson*, 214 Ariz. at 145. "The requirement of a formalized relationship between the parties has been quietly eroding . . . and, when public policy has supported the existence of a legal obligation, courts have imposed duties for the protection of

---

[7] The Monjes assert three theories of liability in the underlying case: strict products liability, negligence, and breach of implied warranty. (Doc. 1-1 (Am. Compl.).) No Party has contended that BVCPS would be liable to the Monjes on a theory of strict products liability or breach of implied warranty.

persons with whom no preexisting 'relationship' existed." *Stanley*, 208 Ariz. at 221–22. Hence, the law now includes "specific undertakings" as a relationship that may give rise to a duty.

Section 324A of the Restatement outlines the liability to a third party for negligent performance of an undertaking:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965). An example would be if "A Telephone Company employs B to inspect its telephone poles. B negligently inspects and approves a pole adjoining the public highway. Because of its defective condition the pole falls upon and injures a traveler upon the highway. B is subject to liability to the traveler." *Id.* Arizona courts have relied upon § 324A to find liability to a third party. *See Papastathis v. Beall*, 150 Ariz. 279, 723 P.2d 97 (Ct. App. 1986). In *Papastathis*, a franchisor of a convenience store agreed to inspect, endorse, and recommend a certain type of rack on behalf a franchisee. *Id.* at 282. The franchisor was negligent in its inspection and, as a result, a customer was injured when a soda can fell from the rack. The Court found that the franchisor's "failure to exercise reasonable care increased the risk of harm to the third party . . . ." *Id.*

While the existence of a duty is a question of law for the court, see *Gipson*, 214 Ariz. at 143, that inquiry does not operate in a factual vacuum. Instead, the relationships between the parties and their respective roles in the underlying injury shape the analysis. This is not to say that foreseeability is the touchstone in determining the existence of a duty under Arizona law—it is not. *See id.* at 144 ("To clarify, we now expressly hold that

foreseeability is not a factor to be considered by courts when making determinations of duty, and we reject any contrary suggestion in prior opinions."). The need for a factual context, however, makes resolution of this question ill-suited to the limited review that a motion to dismiss entails.

The cases Spin Master cites all involve closer relationships than the one between BVCPS and Aqua Dots consumers. In *Stanley*, the Arizona Supreme Court determined that a radiologist owed a duty of care to the recipient of an x-ray, relying on the close similarities between that situation and the doctor-patient relationship. 208 Ariz. at 222–24. In *SKR Consulting, Inc. v. MMLA Psomas, Inc.*, this Court recognized a duty running from a subcontractor to a contractor and the ultimate recipient of the services, an unexceptional proposition. No. CV-09-0611-PHX-GMS, 2009 WL 2450490 at *4 (D. Ariz. Aug. 11, 2009). While the general contractor hired the subcontractor, the services the subcontractor performed were expressly for the benefit of the ultimate consumer. *Id.* Here, that would be like the relationship between Eurofin and Spin Master, not the relationship between BVCPS and Aqua Dots consumers. Finally, Spin Master relies on the line of cases that recognize a duty between professionals and their clients. *See Flagstaff Affordable Housing, LP v. Design Alliance, Inc.*, 221 Ariz. 433, 437, 212 P.3d 125, 129 (Ct. App. 2009), *vacated on other grounds*, 223 Ariz. 320, 223 P.3d 664 (2010).

Nevertheless, something akin to the situation that § 324A describes is present here. If BVCPS was negligent, as Spin Master alleges, then its failure to exercise reasonable care increased the likelihood consumers would suffer harm from the Aqua Dots. While the risk of injury from ingestion was constantly present in the Aqua Dots, that risk increased when the tests did not show oral toxicity. Before, Spin Master marketed a product that had not yet been tested; now, it could market a product that it had tested and was informed was non-toxic. The inherent harmfulness of the product remained unchanged, but the risk of injury increased due to the assurance and certification provided. Construing the facts pled in the Complaint in the light most favorable to Spin

Master, as the Court must on a 12(b)(6) Motion, it cannot say that no duty exists. One who undertakes to inspect and test a product on behalf of another could be held to have a duty to the ultimate purchaser of that product under a theory like § 324A.

### b. Causation

Even if there is a duty, BVCPS argues that Spin Master has failed to adequately allege causation, a necessary component of liability and therefore a necessary component of a plea for indemnity. Spin Master has alleged that the way BVCPS (through Eurofin) conducted the testing was negligent. But that is insufficient by itself—even if the testing was negligent and produced a faulty result, Spin Master did not receive the results until after the injury in this case occurred. Therefore, BCVPS argues that any negligence on its part in performing the tests was not a proximate cause of the injuries at issue in this case.

But Spin Master has also alleged negligence in the timing of the test, i.e., that BVCPS (through Eurofin)

> floundered and delayed unreasonably for weeks and weeks and was ultimately unable to perform the test in a competent and timely manner. Had Eurofins possessed the capability to perform the test properly, it would have been able to promptly begin the testing process. After dosing the animals with Aqua Dots beads, Eurofins would have achieved a test result within days or weeks of Spin Master's original request.

(Doc. 108 ¶ 14.)

The causal chain that Spin Master lays is not so implausible as to warrant dismissal. Spin Master asserts two levels of negligence: (1) negligence in how fast the test was conducted and (2) negligence in how the test was conducted. According to Spin Master, had the test been completed on time and in a reasonable manner, it would have allowed Spin Master to put the brakes on the sale of Aqua Dots and issue appropriate warnings that could have stopped RM from ingesting that product. Those allegations are sufficient to sketch the causal chain, and a sketch is all that is needed at this stage. Plausible does not mean likely. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d

162, 184 (2d Cir. 2012) ("[T]o present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true . . . ."). Causation is inherently a fact-based inquiry, and so factual development is necessary to actually determine whether BVCPS actually dragged its feet and whether it was actually negligent. For purposes of a Motion to Dismiss, however, Spin Master has adequately pled a causal chain.

### 2.      No Fault

A necessary component of any indemnity case is that the party asserting indemnity be without active fault. "'[I]ndemnity is an all or nothing proposition damage-wise, and hence should be an all or nothing proposition fault-wise.' Its purpose is neither to apportion damages nor to balance relative degrees of fault, but 'to give full restitution to one who pays damages but is without personal fault.' It permits one defendant to shift the entire loss to one who more justly deserves it." *Herstam v. Deloitte & Touche, LLP*, 186 Ariz. 110, 117–18, 919 P.2d 1381, 1388–89 (Ct. App. 1996) (quoting *Transcon Lines v. Barnes*, 17 Ariz. App. 428, 435, 498 P.2d 502, 509 (1972)).

The Arizona Supreme Court has drawn a distinction between "active" and "passive" negligence. *See Busy Bee Buffet v. Ferrell*, 82 Ariz. 192, 310 P.2d 817 (1957). Thus indemnity is not allowed "where the conduct of the indemnitee made him an 'active [participant] in the liability-creating event.'" *Shea v. Sup. Court of Maricopa Cnty.*, 150 Ariz. 271, 274, 723 P.2d 89, 92 (1986) (quoting *Chrysler Corp. v. McCarthy*, 14 Ariz. App. 536, 538, 484 P.2d 1065, 1067 (1971)). On the other hand, indemnity is available where "1) the party seeking indemnity is not at fault at all; or (2) if he was at fault, his causative contribution ended so that he is held liable only because of the continuing conduct of the indemnitor; or (3) where he is liable only because the law imposes liability upon him for the torts of the indemnitor." *Id.* Passive negligence, then, can be "found in mere nonfeasance, such as the failure to discover a dangerous condition . . . ." *Estes Co. v. Aztec Const., Inc.*, 139 Ariz. 166, 169, 677 P.2d 939, 942 (Ct. App. 1983).

Spin Master has admitted that "on or about November 24, 2006, Moose entered into a distribution agreement with Spin Master whereby the parties agreed that Moose would supply Spin Master with the Aqua Dots beads that are the subject of this litigation." (Doc. 83 ¶ 6.) Spin Master also admits that "a Mercy Gilbert Medical Center nurse named Jonathan called the Spin Master customer care department regarding the ingestion of Aqua Dots. Upon information and belief, it appears that Jonathan was told that the Aqua Dots were non-toxic." (*Id.* ¶ 9.) Spin Master admitted that it "distributed Aqua Dots beads in the United States, including in Maricopa County, Arizona." (*Id.* ¶ 12.) Thus, Spin Master may turn out to be liable for damages.

Nevertheless, construing the allegations contained in the pleadings in the light most favorable to Spin Master, the Court cannot say with certainty whether Spin Master is at fault, and, if it is, whether its fault would be of the active or passive variety. For one, "[w]hether conduct constitutes active or passive negligence depends upon the circumstances of a given case." *Id.* The fact-based nature of this question means that it is typically not resolved on at such an early stage.

Moreover, the fact that Arizona's strict products liability statutes may result in Spin Master's liability if the Monjes can prove the facts supporting their claims is not dispositive of the fault question. *See Transamerica Ins. Co. v. Trico Int'l, Inc.*, 149 Ariz. 104, 716 P.2d 1041 (Ct. App. 1985) ("But the judgment was premised on strict liability rather than fault. If passive negligence does not defeat indemnification, *a fortiori* strict liability does not."). A party's liability does not equate with a finding of fault for purposes of indemnity. Under strict liability, fault is not at issue. *See id.* One can be strictly liable because of a status as a merchant or distributor or landowner and yet be without fault for purposes of indemnification. The ultimate question of fault is too ill-defined on a motion to dismiss for the Court to say that "yes, it is clear that Spin Master was actively at fault in this case." Those allegations have yet to be proven by the Monjes.

Spin Master's ultimate liability, if there is any, could be of either the active or passive variety. Which one is a factual question inappropriate on a Motion to Dismiss.

### C.   Implied Indemnification

Spin Master also claims that BVCPS is liable under a theory of implied indemnification. "'The obligation to indemnify may grow out of an implied contractual relation or out of liability imposed by law.'" *First Bank of Ariz. v. Otis Elevator Co.*, 2 Ariz. App. 596, 597, 411 P.2d 34, 35 (Ct. App. 1966) (quoting 42 C.J.S. Indemnity § 20 at 594, 595). "In the absence of an express indemnity agreement, a party has a right to indemnity when there is an implied contract for indemnity or when justice demands there be the right." *INA Ins. Co. of N. Am. v. Valley Forge Ins. Co.*, 150 Ariz. 248, 252, 722 P.2d 975, 979 (Ct. App. 1986). "[T]he cornerstone of implied indemnity is the relationship of the parties." *Schweber Electronics v. Nat'l Semiconductor Corp.*, 174 Ariz. 406, 410, 850 P.2d 119, 123 (Ct. App. 1992). BVCPS argues that Spin Master has failed to state a claim for implied indemnity because (1) it has not adequately pled the existence of an agreement between Spin Master and BVCPS and (2) the facts as pled fail to establish that Spin Master was free for negligence.

Neither ground is a basis for dismissing the claim. Arizona law does not necessarily require the existence of a contract between two parties to imply a right to indemnification. As the *Schweber Electronics* court noted, "[i]mplied indemnity is a concept born of . . . equitable principles" whose "cornerstone . . . is the relationship of the parties." *Id.* The question whether indemnity would be implied exists independent of any contract between the parties. *See id.* at 410–11 (declining to decide the indemnity question on the existence or not of a contract between the parties, but looking instead to the "relationship of the parties"). Implied indemnity arises "if the evidence establishes an implied contract." *First Bank*, 2 Ariz. App. at 597. Thus Spin Master's claim did not rise or fall on whether it pled the existence of a specific contractual relationship between it and BVCPS. And, for the reasons described in part III.B.2, the question of Spin Master's

fault is a factual question ill-suited to a Motion to Dismiss. Therefore, the implied indemnity claim remains.

## CONCLUSION

Spin Master has failed to put forth a prima facie case that this Court has personal jurisdiction over ESSE, PSL, and BVSA. Its indemnification claims against those Parties must be dismissed. Moreover, Spin Master's designation of ESSE and PSL as nonparties at fault in its Answer was untimely and must be stricken. As for BVCPS, it has not shown that Spin Master's Complaint fails to state a claim against it. Therefore, the claims against BVCPS remain.

**IT IS THEREFORE ORDERED** that ESSE and PSL's Motion to Dismiss (Doc. 126) is **GRANTED**. The Clerk of Court is directed to terminate ESSE and PSL from this case.

**IT IS FURTHER ORDERED** that ESSE and PSL's Motion to Strike (Doc. 126) is **GRANTED**. The designation of ESSE and PSL as non-parties at fault in Spin Master's Amended Answer (Doc. 83 ¶ 44) is hereby stricken.

**IT IS FURTHER ORDERED** that BVCPS's Motion to Dismiss (Doc. 130) is **DENIED.**

**IT IS FURTHER ORDERED** that BVSA's Motion to Dismiss (Doc. 131) is **GRANTED**. The Clerk of Court is directed to terminate BVSA from this case.

**IT IS FURTHER ORDERED** that Spin Master's Motion (Doc. 160) is **DENIED**.

Dated this 30th day of May, 2013.

_H. Murray Snow_

G. Murray Snow
United States District Judge